**FILED**
**Oct 22, 2026**
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**SEALED**

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

(1) Location: 5614 N. Blackstone Avenue, Fresno, California; (2) Person: Dr. Gary G. Hamm

Case No. **1:26-sw-00152-EPG**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and A-2, incorporated by reference.

located in the Eastern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Wire Fraud |
| 18 U.S.C. § 1001 | False Statements |

The application is based on these facts:

See attached affidavit of Special Agent Richard Ficarelli

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

R. Ficarelli
*Applicant's signature*

Richard Ficarelli, Special Agent (DOT-OIG)
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Telephone *(specify reliable electronic means)*.

Date: **Oct 22, 2026**

Erica P. Grosjean
*Judge's signature*

City and state: Fresno, California

Hon. Erica P. Grosjean, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

### Property to Be Searched

The property to be searched is the business office of Dr. Gary Grant Hamm, located at 5614 N. Blackstone Ave, Fresno, California 93710 (the "**TARGET PREMISES**"). Located on the corner of a 19,228-square-foot, single-story shopping center, the **TARGET PREMISES** is a single-story, beige building, with a brown roof, and a tinted glass main entrance and windows facing a commercial parking lot. There is a sign in front and back of the building that states, "Chiropractic Drug Testing" in light blue and red lettering. Agents will not enter and search the barbershop located in the **TARGET PREMISES**.

Below are pictures of the **TARGET PREMISES**:






## ATTACHMENT A-2

### Person to be Searched

The person of DR. GARY G. HAMM, further described as a white male, approximately five feet eleven inches tall, weighing 250 pounds, with a California Driver's License. Below is a photograph from his California Driver's License.



The search of the aforementioned person shall include any and all digital devices, clothing, and personal belongings including backpacks, wallets, briefcases, that are within DR. GARY G. HAMM's immediate vicinity and control while at 5614 N. Blackstone Ave, Fresno, California 93710.

**ATTACHMENT B**

**Items to Be Seized**

The items to be searched for, seized, and examined, are those items on the premises located at 5614 N. Blackstone Ave, Fresno, California 93710, (the "**TARGET PREMISES**"), referenced in Attachment A, that contain evidence, contraband, fruits, and instrumentalities of (1) Wire Fraud, in violation of Title 18, United States Code, Section 1343, (2) Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Section 1349, and False Statements, in violation of Title 18, United States Code, Section 1001 (collectively, the "**TARGET OFFENSES**"). The items to be seized cover the period of 2019, through the date of the execution of the search warrant.

1. Evidence of the **TARGET OFFENSES**, specifically:

   a. Medical Examination Reports for Commercial Driver Fitness Determination (Federal Motor Carrier Safety Administration ("FMCSA") Form MCSA-5875);

   b. Medical Examiner's Certificates (FMCSA Form 5876 and previous versions);

   c. Commercial Motor Vehicle Driver Medical Examination Results Form (FMCSA Form MCSA-5850);

   d. Commercial Driver's Licenses and Permits (including photocopies);

   e. Collection logbooks, letters, e-mails, telephone records, fax transmission logs, notes (whether written or electronic, stored, or maintained), books, diaries, appointment books, calendars, schedules, reference materials, acquisition and disposition records, and other documents related to the above-mentioned DOT and driver related documents;

   f. Any and all records, correspondence, and documents related to the following names/professional license numbers/Federal Motor Carrier Safety Administration National Registry of Certified Medical Examiners numbers: **Dr. Gary Grant Hamm, National Registry #1332885328**

   g. Any and all records, correspondence, and documents related to payments made and received for DOT medical examinations, including but not limited to: ledgers, receipts, bills, records of payments, sales receipts, invoices, accounts receivable records, cancelled checks, and credit card payments to and from (but not limited to) Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, Drug Testing

Center & Consortium, Titan Tank Lines, United Education Institute, Entry-level Driver Training (EDTL) schools, motor carries, truck drivers, and CDL permitting and testing facilities;

h. Any and all records, correspondence, and documents related to contracts or agreements between and amongst Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, Drug Testing Center & Consortium, Titan Tank Lines, United Education Institute, Entry-level Driver Training (EDTL) schools, motor carries, truck drivers, and CDL permitting and testing facilities;

i. Any and all records, correspondence, and documents related to the U.S. Department of Transportation, the Federal Motor Carrier Safety Administration, the National Registry of Certified Medical Examiners, and the State Driver Licensing Agency of any State;

j. Any and all records, correspondence, and documents related to employee records, including payroll, personnel files, and schedules, including work, personal, and travel schedules and calendars;

k. Any and all records, correspondence, and documents between and amongst Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, Drug Testing Center & Consortium, Titan Tank Lines, United Education Institute, Entry-level Driver Training (EDTL) schools, motor carries, truck drivers, and CDL permitting and testing facilities, the U.S. Department of Transportation, the Federal Motor Carrier Safety Administration, and the State Driver Licensing Agency of any State, including but not limited to: emails, faxes, letters, shipping containers and envelopes;

l. Any and all records, books, documents, and equipment relating to the financial activities of Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, and Drug Testing Center & Consortium for DOT medical examinations or other services, bank and other financial account records, expenses and deposits made, cash received, stored, or dispersed, calendars, tax records, appointment books, sign-in sheets, telephone logs, insurance records, billing or payment information, receipts and receipt books, and all business and other financial records, including income records, cash receipts and disbursement records, sales and purchase records, and all sales and expense invoices including all invoices documenting expenses paid by cash (currency), bank check (cashier or teller checks), or other methods;

m. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic

form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies);

n. Dr. Gary G. Hamm's personal cell phone, including if found on his person (to the extent he is found on the **TARGET PREMISES** during the execution of the search warrant);

o. For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

i. evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

ii. evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

v. evidence of the times the Device(s) was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

vii. documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

viii. records of or information about Internet Protocol addresses used by the Device(s);

ix. records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

ERIC GRANT
United States Attorney
CHAN HEE CHU
Assistant United States Attorney
2500 Tulare Street, Suite 4401
Fresno, CA 93721
Telephone: (559) 497-4000
Facsimile: (559) 497-4099

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CASE NO.

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**

**UNDER SEAL**

I, Richard Ficarelli, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

1. I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for warrants to search a premise and a person (if found on the premise) for evidence, contraband, fruits, and instruments of violations of certain criminal statutes.

2. The premise to be searched is 5614 N. Blackstone Avenue, Fresno, California 93710, as further described in Attachment A-1, and hereinafter referred to as the "**TARGET PREMISES**."

3. Attachment A-2 describes Dr. Gary G. Hamm, for the search of his person, should he be found on the **TARGET PREMISES**.

4. The search warrants would authorize the search of the **TARGET PREMISES**

and Dr. Hamm's person if found on the premises, for property and items, digital devices or electronic storage media, further described in Attachment B, for evidence, contraband, fruits, and instruments of violations of the following criminal offenses:

a) Wire Fraud, in violation of Title 18, United States Code, Section 1343;

b) Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Section 1349; and

c) False Statements, in violation of Title 18, United States Code, Section 1001.

These offenses are hereinafter referred collectively as the "**TARGET OFFENSES**."

## II. AGENT BACKGROUND

5. Since January 2020, I have served as a Special Agent with the United States Department of Transportation, Office of Inspector General, hereinafter referred to as "DOT-OIG." As a Special Agent, I am empowered to conduct investigations of, and make arrests for, violations under Title 18 of the United States Code. My official duties therefore include conducting criminal and civil investigations for fraud, waste, and abuse in Department of Transportation programs.

6. As a Special Agent with DOT-OIG, I have participated in and conducted numerous investigations and have obtained and executed search warrants while arresting and prosecuting individuals and companies for violations of regulations and codes relating to the Department of Transportation. I have also helped prosecute companies and individuals charged with violations of offenses listed in Title 18 of the United States Code.

7. Prior to my employment with DOT-OIG, I also served as a Special Agent in the United States Air Force Office of Special Investigations where I conducted investigations into a multitude of federal crimes, including but not limited to, contract fraud, entitlement fraud, healthcare fraud, narcotics offenses, and sex crimes.

8. As to training, I have completed numerous law enforcement training courses throughout my career, including the Criminal Investigator Training Program and the United

States Air Force's Special Investigations Academy, both at Glynco, Georgia.

9. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, interviews of witnesses, a review of records related to this investigation, communications with others who have knowledge of the events and circumstances described herein, and information gained through my training and experience.

10. Because this affidavit is intended only to show that there is sufficient probable cause for the requested warrant, it does not set forth all of my knowledge about this matter.

## III. RELEVANT FMCSA BACKGROUND AND REGULATIONS

11. The Federal Motor Carrier Safety Administration ("FMCSA") is an operating administration of the United States Department of Transportation ("DOT") which develops standards in issuing Commercial Driver's Licenses ("CDLs") to commercial motor vehicle drivers.

12. These standards include medical regulations that ensure commercial motor vehicle drivers are sufficiently physically fit. *See* 49 CFR § 391.41(3)(b) (listing necessary physical qualifications). Pursuant to regulations, no one may operate a commercial motor vehicle unless he or she is medically qualified to do so. 49 CFR § 391.41(a)(1)(i).

13. Drivers obtain this medical qualification via a medical examination (a "physical") performed by a FMCSA-certified medical examiner. Pursuant to regulations, since May 21, 2014, each such medical examination must be conducted by a medical examiner listed on the FMCSA's National Registry of Certified Medical Examiners ("National Registry"). *See* 49 CFR § 391.42.

14. To be included on the National Registry as a FMCSA-certified medical examiner, a person must be an advanced practice nurse, doctor of chiropractic, doctor of medicine, doctor of osteopathy, physician assistant, or other medical professional authorized by applicable State laws and regulations to perform physical examinations. Since May 21, 2014, the person must

also complete a training program and pass a FMCSA-provided medical examiner certification test. 49 CFR § 390.103.

15. Regulations further outline the manner in which the medical examination is to be conducted, including the completion of the Medical Examination Report Form, MCSA-5875 (also known as a "long form") and the Medical Examiner's Certificate, MCSA-5876 (also known as the "medical card"). 49 CFR § 391.43(f), (g). According to the "Instructions for Completing the Medical Examination Report," the driver must fill out Section 1 ("Driver Information") of the Medical Examination Report, which requires demographic information, health history, surgeries, and current medications. Section 2 (Examination Report") should be completed by the Medical Examiner and instructs the Medical Examiner to review the driver's health history with the driver and perform the following checks/tests: pulse rate, height, weight, blood pressure, urinalysis, vision, hearing, and a general physical examination.

16. Once the Medical Examiner completes the examination, s/he must make a determination about the driver's physical qualification to drive and indicate the determination on the Medical Examination Report and Medical Examiner's Certificate. The Medical Examination Report states: "I have performed this evaluation for certification. I have personally reviewed all available records and recorded information pertaining to this evaluation, and attest that to the best of my knowledge, I believe it to be true and correct." The Medical Examiner's Certificate states: "The information I have provided regarding this physical examination is true and complete. A complete Medical Examination Report Form, MCSA-5875, with any attachments embodies my findings completely and correctly, and is on file in my office." The Medical Examiner must sign these forms and therefore must attest to the statements therein.

17. The original copy of the Medical Examination Report must be provided to the person who was examined. The examiner must also provide a copy of the report to a prospective or current employing motor carrier who requests it. The driver must also provide the Medical Examiner's Certificate to his/her State Driver Licensing Agency to document the driver's physical fitness to obtain a CDL.

18. Each original (paper or electronic) completed Medical Examination Report and a copy or electronic version of each Medical Examiner's Certificate must be retained on file at the office of the medical examiner for at least three years from the date of the examination. 49 CFR § 391.43(i). The medical examiner must make all records and information in these files available to an authorized representative of FMCSA or authorized Federal, State, or local enforcement agency representative, within forty-eight hours of request.

19. From May 21, 2014, through June 22, 2018, medical examiners, once every calendar month, were required to electronically transmit to FMCSA, via a secure Web account on the National Registry, a completed CMV Driver Medical Examination Results Form, MCSA-5850. 49 CFR § 391.43(g)(5)(i)(A).

20. Beginning June 22, 2018, after completing a medical examination for any driver who is required to be examined by a medical examiner listed on the National Registry of Certified Medical Examiners, the medical examiner must electronically transmit to FMCSA, via a secure FMCSA-designated website, a completed CMV Driver Medical Examination Results Form, MCSA-5850. The Form must include all information specified for each medical examination as detailed in 49 CFR § 391, which outlines the physical qualifications and necessary medical examinations for commercial motor vehicle drivers.

## IV. PROBABLE CAUSE

### A. Background on HAMM

21. Dr. Gary Grant Hamm, hereinafter referred to as "**HAMM**," is a licensed Doctor of Chiropractic in the State of California, with his license issued on December 5, 1997.

22. Since March 6, 2014, **HAMM** has been a certified DOT Medical Examiner on the Federal Motor Carrier Safety Administration's National Registry of Certified Medical Examiners ("National Registry"). **HAMM**'s National Registry number is 1332885328. As a certified DOT Medical Examiner, **HAMM** has had to register the location of his practice where the medical examinations take place. From on or about January 2, 2014, to March 2, 2022, **HAMM** listed 5612 North Blackstone Avenue, Fresno, California with the National Registry as his place of

practice. Beginning on March 3, 2022, **HAMM** has listed the **TARGET PREMISES** as his place of practice.

23. Since moving to his current place of practice, **HAMM** has operated at least two businesses at the **TARGET PREMISES**: (1) Chiropractic & Massage Center – Dr. Gary G. Hamm, D.C.; and (2) Drug Testing Center (currently renamed as “Drug Testing Center and Consortium”).[1] The two businesses share the same lobby and workstations. The signs outside the **TARGET PREMISES** also similarly market both the Chiropractic and Drug Testing




practices without a clear distinction (picture above).

24. Aside from **HAMM**’s businesses, there is currently one other business operating out of the **TARGET PREMISES**. Based on witness testimony from July 2026 and the current advertisements on the windows, there is a barbershop operating out of the **TARGET PREMISES**.[2] The witness from July 2026 stated that the barbershop operated in one side room.

25. In October of 2024, I submitted a general query to FMCSA as to the medical examiners registered on the National Registry at the **TARGET PREMISES**. At that time, other than **HAMM**, medical examiners Dr. S.M. and Dr. E.B., who were on the National Registry, also listed the **TARGET PREMISES** as a business location. This week, I submitted a query as to

[1] Based on witness statements, the **TARGET PREMISES** is a suite within a shopping mall complex.

[2] As stated in the Authorization section and Attachment A-1, the barbershop will not be searched.

Dr. S.M. and Dr. E.B. Currently, Dr. S.M. but not Dr. E.B. continues to list the **TARGET PREMISES** as a business location. Agents, however, believe that Dr. S.M. conducts most, if not all, of his business in Clovis, California. Not only is the Clovis address listed as Dr. S.M.'s primary practice location on the National Registry, but Dr. S.M.'s own business website, available publicly online, only lists the Clovis location (the **TARGET PREMISES** is listed as an alternative practice location on the National Registry).[3]

26. Regardless of the businesses **HAMM** operates at the **TARGET PREMISES**, **HAMM** has been the only medical examiner authorized to perform DOT physicals under his National Registry medical examiner account.

27. Based on driver data and MCSA-5850 forms uploaded to the National Registry uploaded using **HAMM**'s medical examiner's account, **HAMM** has been a "high performer" of DOT physicals. The FMCSA considers medical examiners to be "high performers" if they complete more than 6,000 DOT physicals in one calendar year. **HAMM** has cleared that threshold from 2023 through 2025, with 7,349 exams conducted in 2025 alone.

28. From 2021 to the beginning of 2026, **HAMM** has purportedly performed approximately 38,726 DOT physicals, a pace of around 645 DOT physicals per month.

**B. <u>Background on STAMPS</u>**

29. Sometime in 2019, **HAMM** hired Curtis Stamps, hereinafter referred to as "**STAMPS**," to work as a masseuse, beginning when **HAMM**'s practice was located at 5612 North Blackstone Avenue, Fresno, California. **STAMPS** has continued to be employed by **HAMM**, including after the move to the **TARGET PREMISES**.

30. **STAMPS** has never had the credentials to be a certified medical examiner on the National Registry and has accordingly never held such a certification. With no formal medical training or experience, **STAMPS** does not have any medical or nursing license in the state of California. According to the California Department of Consumer Affairs, **STAMPS**, is not and

[3] Out of an abundance of caution, to the extent there is any documents or other items identified as belonging to S.M., those materials will not be searched or seized.

has never been an advanced practice nurse, Doctor of Chiropractic, Doctor of Medicine, Doctor of Osteopathy, or a physician assistant. **STAMPS**, in fact, has never even been a licensed masseuse.

31. Prior to working for **HAMM**, **STAMPS** worked at a McDonald's near **HAMM**'s place of business. **STAMPS** had also previously been convicted of drug dealing and theft.

**C. HAMM Unlawfully Authorizes STAMPS and Others to Conduct Physicals**

32. Through interviews and other evidence, investigators have determined that **HAMM** has unlawfully authorized **STAMPS** and others to conduct DOT physicals.

**2. Evidence from Interview of T.M.**

33. On August 30, 2021, DOT-OIG interviewed T.M., formerly **HAMM**'s bookkeeper since 2016. Beginning in 2017, **HAMM** also hired T.M. to manage the DOT drug and alcohol testing program for his Drug Testing Center business.

34. In 2019, T.M. stated that **STAMPS**, a masseuse at the time for the Drug Testing Center business, was investigated by the Fresno Police Department for an incident involving a female customer. Following the incident, **HAMM** had **STAMPS** start performing DOT physicals rather than massages. At first, **STAMPS** performed DOT physicals only on the weekends.

35. Over time, **HAMM** allowed **STAMPS** to perform more physicals, including on weekdays. Eventually, **HAMM** and **STAMPS** also began performing DOT physicals together, with each person responsible for different aspects of the examinations. **HAMM**, for example, would listen to the drivers' heart and lungs while **STAMPS** conducted the eye exam, hearing test, color blindness test, and the urine test.

36. After the DOT physicals were performed, J.G., the office manager for Drug Testing Center and/or **STAMPS** completed the necessary DOT medical exam forms, handed copies of such forms to the drivers and received payment from the drivers. **HAMM** rarely handled the administrative paperwork himself. With **STAMPS**' aid, T.M. estimated that the Drug Testing Center, on average, conducted 30-40 exams daily, charging around $3,000 - $4,000

for those examinations.

37. T.M. stated that businesses began to take notice of the unauthorized DOT physicals performed at the Drug Testing Center. For example, one company who had a contract to send drivers to the Drug Testing Center for their physicals called T.M. after hearing reports of a black medical examiner performing the DOT physicals. The company, however, was aware that **HAMM**, the only individual it knew to be authorized to perform DOT physicals for the Drug Testing Center, was white. Shortly after the phone call, the company ended its relationship with the Drug Testing Center.

38. Following that interaction, T.M. warned **HAMM** about allowing **STAMPS** to conduct DOT physicals without proper certifications. **HAMM** denied allowing **STAMPS** to conduct DOT physicals but also stated that anyone could help him perform such examinations under his license.

39. T.M. stated **HAMM** often traveled abroad with his girlfriend N.W. When traveling, **HAMM** allowed **STAMPS** and others to perform exams in his absence. T.M. provided the years and locations of **HAMM**'s travel and also photographs **HAMM** had posted on Facebook while traveling.

40. On September 12, 2022, DOT-OIG interviewed T.M. again. During this interview, T.M. stated that she had spoken with a student intern working for **HAMM** on or about September 6, 2022. The student intern told T.M. that **HAMM** had traveled to Switzerland in September, leaving him, **STAMPS**, and a female employee in charge of conducting physicals. During **HAMM**'s absence, J.G., **HAMM**'s office manager, also instructed the student intern to assist **STAMPS** with conducting the physicals. These physicals were conducted using DOT medical exam forms pre-signed by **HAMM**. The student intern further stated that **HAMM** spent approximately "90%" of his time out of the office.

3. **<u>Evidence from Interview of D.D.</u>**

41. On October 1, 2021, DOT-OIG interviewed D.D., a former employee of **HAMM**'s. Beginning in 2018, D.D. started working for **HAMM** as a urine specimen collector

at Drug Testing Center. At the end of 2019 or 2020, D.D. left the Drug Testing Center but continued to assist **HAMM** when **HAMM** was short-staffed.

42. Even prior to working for **HAMM**, D.D. had been warned about **HAMM**'s illegal practices. California Highway Patrol Inspectors, with whom D.D. was familiar, warned him about **HAMM**'s "shady" exams. The trucking community allegedly believed **HAMM** would always pass their physical, even for drivers with pre-existing medical conditions.

43. After starting his position at Drug Testing Center, D.D. himself observed improper practices authorized by **HAMM**. **HAMM** allowed **STAMPS** to conduct exams without a DOT medical examiner's certification when **HAMM** was away from the office. For example, between August 7-9, 2019, when **HAMM** was in Panama for vacation, **STAMPS** conducted exams in **HAMM**'s absence. Despite not being certified, **STAMPS** performed blood pressure checks, diabetes checks, eye exams, and whisper tests. **STAMPS** performed these exams using DOT medical exams forms that were pre-signed by **HAMM**. At the end of each business day, J.G., **HAMM**'s office manager, electronically submitted all the completed DOT medical exam forms to the National Registry.

44. Aside from **STAMPS**, **HAMM** also allowed student-employees from the United Education Institute ("UEI") to assist with exams. The students performed blood pressure checks, eye exams, and urine dipstick tests. D.D. believed that the students were not certified medical examiners given their student status.

45. At some point, **HAMM** also hired a traveling chiropractor from San Diego, California, to conduct physicals. But **STAMPS** still conducted all of the medical exams other than the vision test. The chiropractor only performed the vision test in an attempt D.D. believes to allow **HAMM** to claim that a certified medical examiner had conducted the physicals. The relevant forms for these physicals, however, were still signed by **HAMM**.

46. **HAMM** also asked D.D. to perform physicals but D.D. declined to do so.[4]

---

[4] Lonnie Edwards, a certified medical examiner, also allegedly helped **HAMM** perform some

4. **Evidence from Interview of J.S.**

47. On February 13, 2023, DOT-OIG interviewed J.S., a truck driver who had had his physical performed at the Drug Testing Center. J.S. did not recall the date of his physical but explained he had gone to the Drug Testing Center as a walk-in client. During the initial interview, J.S. stated that an older white male in his mid to late 50s or 60s had completed his physical. But after the interview, J.S. contacted me and stated that the medical examiner who had performed his physical was a black male, with an athletic build, potentially in his late 40s. J.S. stated that this medical examiner had not provided his name but had signed his Department of Transportation medical exam forms, providing him with copies of the documents (Form MCSA-5875 and Form MCSA-5876).

48. J.S.'s medical forms from the Drug Testing Center stated that his physical was purportedly completed by **HAMM** on August 6, 2021, at **HAMM**'s office. The forms had **HAMM**'s signature, certifying that J.S. met the standards outlined in 49 CFR § 391.41.

49. **HAMM**'s travel data travel data obtained via United States Customs and Border Protection ("CBP") showed that from August 6, 2021, through August 9, 2021, **HAMM** had traveled to Cozumel, Mexico.

5. **Interview with J.V.**

50. On March 17, 2025, DOT-OIG interviewed J.V., a commercial truck driver. During the interview, J.V. stated that he completed his most recent physical in August 2024. While unable to recall the name or exact location of the medical office, J.V. remembered that it was located near Bullard and Blackstone in Fresno, California.

51. Upon arrival at the site in August 2024, J.V. provided the receptionist with a slip his trucking company had given him to go to the office to complete his physical. After completing a medical questionnaire (form MCSA-5875), an African American male in his early forties completed J.V.'s physical, including the vision test, height-and-weight check, duck walk,

---

examinations on occasion.

and reflex test. J.V. did not recall the person's name.

52. After the physical, a white male entered the exam room stating, "Congratulations you passed the physical," and asked J.V. if he had any questions. J.V. believed the white male to be the "main doctor" based on his manner of dress. The white male reviewed J.V.'s paperwork and signed J.V.'s medical examination report form. J.V. stated that the white male had not been present in the exam room during his physical and did not assist with any of the examinations.

53. On July 23, 2026, DOT-OIG interviewed J.V. again. During this interview, J.V. contacted me to report on his experience renewing his DOT physical at the **TARGET PREMISES** on July 23, 2026. After arriving at the **TARGET PREMISES**, J.V. initially encountered three employees: (1) a Spanish speaking Hispanic woman; (2) a Hispanic male; and (3) an African American male. J.V. recognized the African American male as the person who performed his physical in August 2024.

54. After J.V. filled out his medical paperwork, the Hispanic male escorted J.V. to a hallway and checked J.V's hearing, vision, weight, and blood pressure. The Hispanic male also asked J.V. to perform a toe-touch and a squat, lift his shirt to check for scars, and provide a urine sample. The Hispanic male then completed J.V.'s medical paperwork and handed it to a Caucasian male for review. J.V. assumed the Caucasian male was the doctor because he overheard the African American male instruct another patient to wait for the doctor, referring to the same Caucasian male.

55. The "doctor" did not provide J.V. his name. J.V. described the "doctor" as being in his early 50s, weighing approximately 300 pounds, clean-shaven, and having dark brown hair. J.V. stated that the medical forms came with the medical examiner's signature block already signed and that he did not observe the doctor sign any of his paperwork.

56. After performing the physical, the Hispanic male made copies of J.V.'s paperwork, gave him the originals, and instructed him to take them to the California Department of Motor Vehicles. J.V. estimated that the physical took ten to eleven minutes to complete.

57. DOT forms uploaded to the National Registry stated that **HAMM** performed

J.V.'s physical dated July 23, 2026.

6. **Interview of J.N. and J.H.**

58. On December 5, 2025, DOT-OIG interviewed J.N. and J.H., owners of a different DOT drug testing consortium in Fresno, California. J.N. and J.H., based on their knowledge of the drug testing community and the clients it serves, described **HAMM** as a "well-known con artist" who had conducted illegal DOT drug testing for approximately 25 years. J.H. further stated that **HAMM** employed an individual known as "Dr. Black," who performed physicals for truck drivers despite lacking the credentials to do so. After investigators asked whether the name **STAMPS** sounded familiar, J.H. confirmed that **STAMPS** worked for **HAMM** and was the individual known as "Dr. Black." J.H. claimed that he and D.D. had submitted a complaint to FMCSA three to four years prior, with a photograph of **STAMPS** conducting a physical in **HAMM**'s office.

59. On September 25, 2024, I had received an email from FMCSA regarding a complaint from an anonymous source about a physical performed by **STAMPS** on August 6, 2020, while **HAMM** was outside of the United States. The anonymous complaint included a photograph of **STAMPS** conducting an exam with a customer while **HAMM** was purportedly in



DR HAMM WAS ON VACATION IN DOMINICAN REPUBLIC WHEN THESE PHOTOS WERE TAKEN. AUGUST 6, 2020

THE MAN PICTURED COMPLETING A DOT EXAM IS CURTIS STAMPS ON A BLANK DOT FORM PRE-SIGNED BY DR GARY HAMM!!

CURTIS IS KNOWN AS "DR BLACK" AND HAS BEEN VERY POPULAR WITH TRUCK DRIVERS FOR 8+ YEARS.

HE IS A LOCAL CON-ARTIST WITH NO CREDENTIALS WHAT-SO-EVER!

the Dominican Republic. This anonymous complaint appears to be that submitted by J.H. and D.D. Above is a picture submitted as part of the anonymous complaint.

7. **<u>Border Crossing Evidence</u>**

60. Using **HAMM**'s travel data obtained via United States Customs and Border Protection, I have been able to cross-reference **HAMM**'s dates of travel with DOT physicals submitted to the National Registry during those periods. Consistent with witnesses' statements, **HAMM** purported to conduct DOT physicals during his times of travel. As detailed in the table below, **HAMM** has submitted 1,384 DOT physicals during periods of his travel, supporting the witnesses' statements that **HAMM** has been authorizing others to conduct DOT physicals on his behalf and using his name. As recently as August of this year,[5] **HAMM** submitted 147 DOT physicals to the National Registry while on vacation.[6]

///

///

///

///

///

///

///

///

///

///

///

///

///

[5] I recently learned that HAMM's medical examiner status has been suspended since September 2, 2026, due to failure to update relevant information.

[6] DOT-OIG also conducted interviews with individuals who confirmed that they had physicals at the **TARGET PREMISES** during periods of **HAMM**'s vacation.

| Country/State | Dates | | Number of DOT Physicals Submitted to the National Registry |
|---|---|---|---|
| | From | To | |
| Cozumel (CZM) | 08/06/2021 | 08/09/2021 | 54 |
| Lisbon (LIS)/Vancouver (YVR) | 08/03/2022 | 08/10/2022 | 137 |
| Nashville, TN | 02/11/2023 | 02/14/2023 | 49 |
| Kalispell, MT (FCA)/Bozeman, MT (BZN) | 05/27/2023 | 05/30/2023 | 32 |
| Anchorage, AK (ANC) | 07/23/2023 | 07/27/2023 | 109 |
| Narita, Tokyo (NRT) | 08/04/2023 | 08/09/2023 | 120 |
| Bozeman, MT (BZN) | 04/13/2024 | 04/15/2024 | 55 |
| Honolulu, HI (HNL) | 05/10/2024 | 05/13/2024 | 78 |
| Kalispell, MT (FCA) | 06/14/2024 | 06/17/2024 | 54 |
| Nadi (NAN) | 08/02/2024 | 08/08/2024 | 169 |
| Canada | 03/12/2025 | 03/14/2025 | 130 |
| Rome, Fiumicino | 08/04/2025 | 08/12/2025 | 186 |
| Bozeman, MT (BZN) | 10/28/2025 | 10/30/2025 | 64 |
| Denver/Iceland/Seattle | 08/01/2026 | 08/09/2026 | 147 |
| Total | | | 1,384 |

**D. <u>The Physicals Conducted Failed to Meet Regulation Standards</u>**

61. Aside from authorizing non-certified individuals to conduct DOT physicals using his name and National Registry account, **HAMM** and his employees also filled out the DOT forms fraudulently or began to engage in other fraudulent practices.

1. **<u>Evidence from Interview of T.M.</u>**

62. During her initial interview with DOT-OIG, T.M. stated that **STAMPS**, beyond performing DOT physicals without proper credentials, began to expand upon his fraudulent conduct. For customers with pre-existing conditions (e.g., diabetes), for example, **STAMPS** began charging an additional payment of $100 for a 2-year medical certificate. **STAMPS** also began targeting Indian drivers with limited English skills by lying to them that their urine tests came back positive for diabetes. After falsely claiming that the drivers had diabetes, **STAMPS** then charged the drivers an additional $100 to certify that they had passed their DOT physical.

63. T.M. stated that **HAMM** was directly involved in this type of fraudulent conduct. In 2019, for example, T.M. stated that **HAMM** had had to sit for depositions in cases involving fatal accidents. **HAMM** was asked, for example, how a driver could have passed the physical despite potential health conditions that may have led the driver to fall asleep behind the wheel. T.M. stated that **HAMM** would always answer that the drivers were not honest about their health conditions. However, T.M. stated that these were questions that were never asked by **HAMM** and others **HAMM** authorized to conduct physicals.

2. **<u>Evidence from Interview of D.D</u>.**

64. During his interview with DOT-OIG, D.D. also spoke of fraudulent testing by **HAMM**. On one occasion, **HAMM** instructed **STAMPS** to falsely certify that a driver was fit to operate a vehicle. At the time of the DOT physical, the driver had a broken neck following a suicide attempt and was also actively taking anti-depressant medication. Given the driver's unfitness to operate a motor vehicle, D.D. confronted **HAMM** about this physical but **HAMM** disregarded D.D.'s concerns.

65. D.D. also heard from a colleague near the date of his interview with DOT-OIG

that **HAMM** had certified that a driver with one leg had passed the DOT physical. D.D.'s colleague stated that the driver's DOT forms omitted that the driver only had one leg. *See* 49 C.F.R. § 391.41(b)(1) (stating a a person is physically qualified to drive a commercial motor vehicle if that person "[h]as no loss of a foot, a leg . . . . .").

66. D.D. also stated that another local chiropractor stated that **HAMM** intentionally obtained false low readings of blood pressure by using a larger than necessary blood pressure cuff. **HAMM** obtained these false low readings to knowingly and falsely certify that drivers with high blood pressure had passed their DOT physicals. *See* 49 C.F.R. § 391.41(b)(6) (stating a a person is physically qualified to drive a commercial motor vehicle if that person "[h]as no current clinical diagnosis of high blood pressure likely to interfere with his/her ability to operate a commercial motor vehicle safely.").

3. **Undercover Evidence**

67. On May 10, 2023, DOT-OIG and the California Department of Motor Vehicles ("DMV"), Investigations Division ("DMV-ID"), conducted an undercover operation at the **TARGET PREMISES**. A DMV-ID undercover agent ("UCA") was tasked with entering the **TARGET PREMISES** to undergo a physical required to obtain a commercial driver's license. The UCA had an audio recording device during the operation. During the operation, other investigators conducted surveillance near the **TARGET PREMISES**.

68. At approximately 10:37 a.m., the UCA turned on the recording device and entered the **TARGET PREMISES**. For the medical exams for the physical, a woman named "Veronica" took the UCA's vitals and conducted the closed fist, squat, whisper, and vision tests. Aside from reviewing paperwork (Forms MCSA-5875 and MCSA-5876), **HAMM** only listened to the UCA's heart/lungs and had the UCA squeeze **HAMM**'s hands. Shortly thereafter, **HAMM** provided the UCA with the medical forms, finding the UCA to have passed the physical. The UCA paid $100 fee in cash for the physical and exited the clinic at approximately 11:07 a.m.

4. **Interview of J.N. and J.H.**

69. During his interview with DOT-OIG, J.H. also stated that **HAMM** was well-known to certify drivers as passing their DOT physical for an additional fee. According to J.H., **HAMM** charged drivers $100 for a standard exam and $200 to $300 for a "clear" exam---meaning that **HAMM** would certify that the individual had passed their DOT physical regardless of the individual's health.

5. **Call from California DMV-Investigations Division**

70. On September 30, 2025, I received a phone call from DMV-ID regarding a commercial driver's license ("CDL") applicant suspected of submitting fraudulent medical documentation signed by **HAMM**. G.S., the CDL applicant, had submitted medical documentation stating that his vision was 20/20. A DMV representative, however, observed that G.S.'s eyes appeared crossed and administered a follow-up vision test which G.S. failed. Following the failed eye exam, G.S. admitted that he had no vision in his right eye and abruptly left the office. G.S.'s medical documentation (Form MCSA-5875 and Form MCSA-5876), submitted as part of his CDL application, were dated September 23, 2025, and signed by **HAMM**. The documentation also listed the **TARGET PREMISES** as **HAMM**'s office location.

## V. AUTHORIZATION REQUEST

71. The property to be searched includes computers, and/or tablets used, or controlled by **HAMM** and his employees. In addition, the property to be searched include **HAMM**'s personal cell phone and we request agents be authorized to seize **HAMM**'s phone even if the cell phone is on **HAMM**'s person (to the extent he is found on the **TARGET PREMISES** during the execution of the search warrants).[7]

72. Based on my training and experience, I believe that evidence of the **TARGET OFFENSES** will be found not only in physical paper form but also as data in computers and

[7] Agents will not seize any other personal cell phones.

tablets used by **HAMM** and his employees, and also **HAMM**'s personal cell phone. For example, I know that each original (paper or electronic) completed Medical Examination Report and a copy or electronic version of each Medical Examiner's Certificate must be retained on file at the office of the medical examiner for at least 3 years from the date of the examination. As detailed previously, employees at the Drug Testing Center and Consortium also used such devices to upload such reports to the National Registry. And more generally, based on interviews with former employees and clients of the Drug Testing Center and Consortium, like most modern businesses, much of the work at the **TARGET PREMISES** is performed using digital devices. I believe such devices will have evidence of the **TARGET OFFENSES**, including not only client information, the purported examinations that were performed, but also payment details which may demonstrate unlawful higher costs for fraudulent DOT physicals. And as to **HAMM**'s cell phone specifically, based on my training and experience, I know that doctors and small business owners often communicate with their staff and conduct business more generally using their personal cell phones. Moreover, as detailed above, given **HAMM**'s frequent travels, including abroad, **HAMM** is likely to have communicated with staff using his personal phone while his business continued to operate in his absence.

**A. <u>Technical Terms</u>**

73. Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a. "Digital device," as used herein, includes the following three terms and their respective definitions:

1) A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1). Computers are physical units of equipment that perform information

processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2) "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3) "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b. "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the

telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c. A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

e. "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security

software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f. "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g. Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i. "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon

the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

m. “Cache” means the text, image, and graphic files sent to and temporarily stored by a user’s computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

p. “Encryption” is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

**B. <u>Computers, Electronic/Magnetic Storage, and Forensic Analysis</u>**

74. As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the **TARGET PREMISES**, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers;

personal digital assistants; wireless communication devices, such as telephone paging devices, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the **TARGET PREMISES**, there is probable cause to believe that the items described in Attachment B will be stored in the device(s) for at least the following reasons:

75. As discussed above, individuals who engage in the **TARGET OFFENSES** use digital devices to access websites like the National Registry to facilitate illegal activity; to store on digital devices, documents and records relating to their illegal activity, including those they must keep as part of DOT regulations. Given the number of individuals involved---not only employees but also individuals seeking fraudulent DOT documentation---there is likely to be evidence of the **TARGET OFFENSES** via the use of email correspondence, text or other "Short Message Service" ("SMS") messages. Contact information of other co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging are also likely to be stored on digital devices. And finally, transactional data, including those from the illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators, are likely to be found on digital devices.

76. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

77. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

78. As further described in Attachment B, this application seeks permission to locate

not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the device(s) at issue here because:

79. Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the

times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

80. Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

81. A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

82. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the

scope of the warrant.

83. Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user. I know that when an individual uses a digital device to commit the **TARGET OFFENSES**, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

### C. Methods to be Used to Search Digital Devices

84. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

85. Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of

information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

86. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

87. Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

88. Digital device users can attempt to conceal data within digital devices through a

number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

89. Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of

data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

90. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

91. The volume of data stored on many digital devices will typically be so large that it

will be extremely impractical to search for data during the physical search of the premises.

92. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing the search warrants will employ the following procedures:

93. Upon securing the **TARGET PREMISES**, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the **TARGET PREMISES**. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

94. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist

that are related to the subject matter of the investigation.

95. In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover “deleted,” “hidden,” or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

96. As detailed above, **HAMM** operates businesses on the **TARGET PREMISES**. **HAMM**’s Drug Testing Center and Consortium (“the Company”) is a functioning company that conducts legitimate business. The seizure of the Company’s digital devices may limit the Company’s ability to conduct its legitimate business. As with any search warrant, I expect that these warrants will be executed reasonably. Reasonable execution will likely involve conducting an investigation on the scene of what digital devices must be seized or copied, and what digital devices need not be seized or copied. Where appropriate, law enforcement personnel executing the warrant will copy data, rather than physically seize digital devices, to reduce the extent of disruption. If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company’s legitimate business. If, after inspecting seized digital devices, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve evidence, the government will return it.

97. Agents also will not enter and search the barbershop located at the **TARGET PREMISES**.

98. Agents also will not search or seize any materials identified as belonging to Dr. S.M.

99. I further request that the Court order that all papers in support of this application, including the affidavit and search warrants, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

## VI. CONCLUSION

100. Based on the aforementioned facts, I believe that the **TARGET PREMISES** contain fruits, evidence and instrumentalities of violations of the following offenses: (1) Wire Fraud, in violation of Title 18, United States Code, Section 1343; (2) Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Section 1349; and (3) False Statements, in violation of Title 18, United States Code, Section 1001. Therefore, I request that search warrants be issued for the **TARGET PREMISES** described in Attachments A-1 and A-2 for the purpose of identifying and seizing the fruits, evidence and instrumentalities particularly described in Attachment B.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

R. Ficarelli
Richard Ficarelli
Special Agent
U.S. Department of Transportation, Office of Inspector General

This Affidavit was submitted to me by email/pdf and attested to me as true and accurate by telephone, consistent with Fed. R. Crim. P. 4.1, and 41(d)(3) on Oct 22, 2026.

Erica P. Grosjean
Hon. Erica P. Grosjean
United States Magistrate Judge

Reviewed as to form.

*/s/ Chan Hee Chu*
CHAN HEE CHU
Assistant U.S. Attorney

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

SEALED

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

(1) Location: 5614 N. Blackstone Avenue, Fresno, California; (2) Person: Dr. Gary G. Hamm

Case No. **1:26-sw-00152-EPG**

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Eastern District of California *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2, attached hereto and incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before November 3, 2026 *(not to exceed 14 days)*

❒ in the daytime 6:00 a.m. to 10:00 p.m. ❒ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any authorized EDCA magistrate judge.
*(United States Magistrate Judge)*

❒ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❒ for _____ days *(not to exceed 30)* ❒ until, the facts justifying, the later specific date of ______________.

Date and time issued: **3:32 PM, Oct 22, 2026**

Erica P. Grosjean
*Judge's signature*

City and state: Fresno, California

Hon. Erica P. Grosjean, U.S. Magistrate Judge
*Printed name and title*

AO 93 (Rev. 11/13) Search and Seizure Warrant (Page 2)

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**ATTACHMENT A-2**

**Person to be Searched**

The person of DR. GARY G. HAMM, further described as a white male, approximately five feet eleven inches tall, weighing 250 pounds, with a California Driver's License. Below is a photograph from his California Driver's License.



The search of the aforementioned person shall include any and all digital devices, clothing, and personal belongings including backpacks, wallets, briefcases, that are within DR. GARY G. HAMM's immediate vicinity and control while at 5614 N. Blackstone Ave, Fresno, California 93710.

**ATTACHMENT B**

**Items to Be Seized**

The items to be searched for, seized, and examined, are those items on the premises located at 5614 N. Blackstone Ave, Fresno, California 93710, (the "**TARGET PREMISES**"), referenced in Attachment A, that contain evidence, contraband, fruits, and instrumentalities of (1) Wire Fraud, in violation of Title 18, United States Code, Section 1343, (2) Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Section 1349, and False Statements, in violation of Title 18, United States Code, Section 1001 (collectively, the "**TARGET OFFENSES**"). The items to be seized cover the period of 2019, through the date of the execution of the search warrant.

1. Evidence of the **TARGET OFFENSES**, specifically:

   a. Medical Examination Reports for Commercial Driver Fitness Determination (Federal Motor Carrier Safety Administration ("FMCSA") Form MCSA-5875);

   b. Medical Examiner's Certificates (FMCSA Form 5876 and previous versions);

   c. Commercial Motor Vehicle Driver Medical Examination Results Form (FMCSA Form MCSA-5850);

   d. Commercial Driver's Licenses and Permits (including photocopies);

   e. Collection logbooks, letters, e-mails, telephone records, fax transmission logs, notes (whether written or electronic, stored, or maintained), books, diaries, appointment books, calendars, schedules, reference materials, acquisition and disposition records, and other documents related to the above-mentioned DOT and driver related documents;

   f. Any and all records, correspondence, and documents related to the following names/professional license numbers/Federal Motor Carrier Safety Administration National Registry of Certified Medical Examiners numbers: **Dr. Gary Grant Hamm, National Registry #1332885328**

   g. Any and all records, correspondence, and documents related to payments made and received for DOT medical examinations, including but not limited to: ledgers, receipts, bills, records of payments, sales receipts, invoices, accounts receivable records, cancelled checks, and credit card payments to and from (but not limited to) Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, Drug Testing

Center & Consortium, Titan Tank Lines, United Education Institute, Entry-level Driver Training (EDTL) schools, motor carries, truck drivers, and CDL permitting and testing facilities;

h. Any and all records, correspondence, and documents related to contracts or agreements between and amongst Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, Drug Testing Center & Consortium, Titan Tank Lines, United Education Institute, Entry-level Driver Training (EDTL) schools, motor carries, truck drivers, and CDL permitting and testing facilities;

i. Any and all records, correspondence, and documents related to the U.S. Department of Transportation, the Federal Motor Carrier Safety Administration, the National Registry of Certified Medical Examiners, and the State Driver Licensing Agency of any State;

j. Any and all records, correspondence, and documents related to employee records, including payroll, personnel files, and schedules, including work, personal, and travel schedules and calendars;

k. Any and all records, correspondence, and documents between and amongst Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, Drug Testing Center & Consortium, Titan Tank Lines, United Education Institute, Entry-level Driver Training (EDTL) schools, motor carries, truck drivers, and CDL permitting and testing facilities, the U.S. Department of Transportation, the Federal Motor Carrier Safety Administration, and the State Driver Licensing Agency of any State, including but not limited to: emails, faxes, letters, shipping containers and envelopes;

l. Any and all records, books, documents, and equipment relating to the financial activities of Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, and Drug Testing Center & Consortium for DOT medical examinations or other services, bank and other financial account records, expenses and deposits made, cash received, stored, or dispersed, calendars, tax records, appointment books, sign-in sheets, telephone logs, insurance records, billing or payment information, receipts and receipt books, and all business and other financial records, including income records, cash receipts and disbursement records, sales and purchase records, and all sales and expense invoices including all invoices documenting expenses paid by cash (currency), bank check (cashier or teller checks), or other methods;

m. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic

form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies);

n. Dr. Gary G. Hamm's personal cell phone, including if found on his person (to the extent he is found on the **TARGET PREMISES** during the execution of the search warrant);

o. For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

i. evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

ii. evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

v. evidence of the times the Device(s) was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

vii. documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

viii. records of or information about Internet Protocol addresses used by the Device(s);

ix. records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

The term “digital devices” includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

SEALED

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

(1) Location: 5614 N. Blackstone Avenue, Fresno, California; (2) Person: Dr. Gary G. Hamm

Case No. **1:26-sw-00152-EPG**

## SEARCH AND SEIZURE WARRANT

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Eastern District of California *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, attached hereto and incorporated herein by reference.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, attached hereto and incorporated herein by reference.

**YOU ARE COMMANDED** to execute this warrant on or before November 3, 2026 *(not to exceed 14 days)*

❐ in the daytime 6:00 a.m. to 10:00 p.m. ❐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to any authorized EDCA magistrate judge.
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for ____ days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ____________ .

Date and time issued: **3:33 PM, Oct 22, 2026** — Erica P. Grosjean
*Judge's signature*

City and state: Fresno, California — Hon. Erica P. Grosjean, U.S. Magistrate Judge
*Printed name and title*

**Return**

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ____________________

____________________
*Executing officer's signature*

____________________
*Printed name and title*

**ATTACHMENT A-1**

**Property to Be Searched**

The property to be searched is the business office of Dr. Gary Grant Hamm, located at 5614 N. Blackstone Ave, Fresno, California 93710 (the "**TARGET PREMISES**"). Located on the corner of a 19,228-square-foot, single-story shopping center, the **TARGET PREMISES** is a single-story, beige building, with a brown roof, and a tinted glass main entrance and windows facing a commercial parking lot. There is a sign in front and back of the building that states, "Chiropractic Drug Testing" in light blue and red lettering. Agents will not enter and search the barbershop located in the **TARGET PREMISES**.

Below are pictures of the **TARGET PREMISES**:






## ATTACHMENT B

## Items to Be Seized

The items to be searched for, seized, and examined, are those items on the premises located at 5614 N. Blackstone Ave, Fresno, California 93710, (the "**TARGET PREMISES**"), referenced in Attachment A, that contain evidence, contraband, fruits, and instrumentalities of (1) Wire Fraud, in violation of Title 18, United States Code, Section 1343, (2) Conspiracy to Commit Wire Fraud, in violation of Title 18, United States Code, Section 1349, and False Statements, in violation of Title 18, United States Code, Section 1001 (collectively, the "**TARGET OFFENSES**"). The items to be seized cover the period of 2019, through the date of the execution of the search warrant.

1. Evidence of the **TARGET OFFENSES**, specifically:

   a. Medical Examination Reports for Commercial Driver Fitness Determination (Federal Motor Carrier Safety Administration ("FMCSA") Form MCSA-5875);

   b. Medical Examiner's Certificates (FMCSA Form 5876 and previous versions);

   c. Commercial Motor Vehicle Driver Medical Examination Results Form (FMCSA Form MCSA-5850);

   d. Commercial Driver's Licenses and Permits (including photocopies);

   e. Collection logbooks, letters, e-mails, telephone records, fax transmission logs, notes (whether written or electronic, stored, or maintained), books, diaries, appointment books, calendars, schedules, reference materials, acquisition and disposition records, and other documents related to the above-mentioned DOT and driver related documents;

   f. Any and all records, correspondence, and documents related to the following names/professional license numbers/Federal Motor Carrier Safety Administration National Registry of Certified Medical Examiners numbers: **Dr. Gary Grant Hamm, National Registry #1332885328**

   g. Any and all records, correspondence, and documents related to payments made and received for DOT medical examinations, including but not limited to: ledgers, receipts, bills, records of payments, sales receipts, invoices, accounts receivable records, cancelled checks, and credit card payments to and from (but not limited to) Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, Drug Testing

Center & Consortium, Titan Tank Lines, United Education Institute, Entry-level Driver Training (EDTL) schools, motor carries, truck drivers, and CDL permitting and testing facilities;

h. Any and all records, correspondence, and documents related to contracts or agreements between and amongst Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, Drug Testing Center & Consortium, Titan Tank Lines, United Education Institute, Entry-level Driver Training (EDTL) schools, motor carries, truck drivers, and CDL permitting and testing facilities;

i. Any and all records, correspondence, and documents related to the U.S. Department of Transportation, the Federal Motor Carrier Safety Administration, the National Registry of Certified Medical Examiners, and the State Driver Licensing Agency of any State;

j. Any and all records, correspondence, and documents related to employee records, including payroll, personnel files, and schedules, including work, personal, and travel schedules and calendars;

k. Any and all records, correspondence, and documents between and amongst Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, Drug Testing Center & Consortium, Titan Tank Lines, United Education Institute, Entry-level Driver Training (EDTL) schools, motor carries, truck drivers, and CDL permitting and testing facilities, the U.S. Department of Transportation, the Federal Motor Carrier Safety Administration, and the State Driver Licensing Agency of any State, including but not limited to: emails, faxes, letters, shipping containers and envelopes;

l. Any and all records, books, documents, and equipment relating to the financial activities of Dr. Gary G. Hamm, Gary G. Hamm, D.C., Drug Testing Center, and Drug Testing Center & Consortium for DOT medical examinations or other services, bank and other financial account records, expenses and deposits made, cash received, stored, or dispersed, calendars, tax records, appointment books, sign-in sheets, telephone logs, insurance records, billing or payment information, receipts and receipt books, and all business and other financial records, including income records, cash receipts and disbursement records, sales and purchase records, and all sales and expense invoices including all invoices documenting expenses paid by cash (currency), bank check (cashier or teller checks), or other methods;

m. As used above, the terms “records” and “information” includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic

form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies);

n. Dr. Gary G. Hamm's personal cell phone, including if found on his person (to the extent he is found on the **TARGET PREMISES** during the execution of the search warrant);

o. For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

i. evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

ii. evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

v. evidence of the times the Device(s) was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

vii. documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

viii. records of or information about Internet Protocol addresses used by the Device(s);

ix. records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.